Joseph M. Vanek, Esquire    (IL Bar No. 6197046)
David P. Germaine, Esquire (IL Bar No. 6274984)
Alberto Rodriguez, Esquire  (IL Bar No. 6293650)
VANEK, VICKERS & MASINI, P.C.
55 W. Monroe Street
Suite 3500
Chicago, Illinois 60603
Tel:   (312) 224-1500
Fax:   (312) 224-1510
JVanek@Vaneklaw.com
DGermaine@Vaneklaw.com
ARodriguez@Vaneklaw.com

Paul E. Slater, Esquire
Sperling & Slater, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel:   (312) 641-3200
Fax:   (312) 641-6492
PES@Sperling-law.com

*Attorneys for the Direct Action Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Meijer, Inc. and Meijer Distribution, Inc.,<br><br>        Plaintiffs,<br><br>vs.<br><br>Bumble Bee Foods LLC, StarKist Company, Dongwon Industries Co. Ltd, Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc., and Thai Union Frozen Products PCL,<br><br>        Defendants.<br>_____/ | Case No:  '16CV0398 JLS  MDD |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (individually and collectively the "**Plaintiffs**") sue Bumble Bee Foods LLC, StarKist Company, Dongwon Industries Co. Ltd, Tri-

Union Seafoods LLC d/b/a Chicken of the Sea International, Inc., and Thai Union Frozen Products PCL (collectively the "**Defendants**") and allege as follows:

I.    **NATURE OF ACTION**

1.    This antitrust action arises out of a continuing conspiracy among Defendants and their co-conspirators not to compete on the sale of canned tuna sold to Plaintiffs and others in the United States beginning at a time yet to be determined, but no later than approximately 2010-2011, and continuing until at least July 2015.

2.    Plaintiffs own or operate retail stores.  During the conspiracy, Plaintiffs purchased canned tuna directly from one or more Defendants and their co-conspirators.  As alleged more fully below, by and through their conspiracy, Defendants and their co-conspirators fixed, stabilized, maintained and/or increased above a competitive level the price of canned tuna sold to Plaintiffs and others in the United States.  As a proximate result of the conspiracy, Defendants and their co-conspirators directly overcharged Plaintiffs and others in the United States for canned tuna in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs seek only overcharge damages in this Complaint.

3.    During the conspiracy, canned tuna was a commodity product or possessed commodity-like characteristics.  No Defendant or their co-conspirator could by themselves sustainably affect canned tuna prices in the U.S.  Apparently Defendants recognized the need to act together and they did.

4.    The existence of the conspiracy is supported by, among other things, one or more allegations below, including *inter alia*: (i) Beginning at least in 2010-2011 and continuing at least through July 2015, Defendants and their co-conspirators' pricing of canned tuna to Plaintiffs and others in the United States is explainable only through conspiratorial action.  During this period, there was a large increase in the supply of canning-grade tuna coupled with decreasing U.S. demand for canned tuna.  This should have caused U.S. canned tuna prices to decline precipitously.  But instead, these prices increased (significantly).  In this environment, Defendants' and their co-conspirators' canned tuna price increases and resistance to normal supply-demand pressures would

have been against their self-interest unless they were colluding.  A Defendant or its co-conspirator that increased prices in this environment, or refused to lower prices as supply increased and demand fell, risked the loss of market share (and attendant revenue and profits) to rivals; (ii) Defendants and their co-conspirators had an opportunity to collude, and they did collude, through several means, including, without limitation, certain trade groups, identified below, which facilitated their conspiracy and provided them with cover to conceal their unlawful conduct; (iii) Defendants and their co-conspirators had direct meetings and communications among them, including in-person meetings, telephone calls, and e-mails in furtherance of their conspiracy; and (iv) The market for the production and sale of canned tuna was conducive to cartelization because, *inter alia*: (a) as noted earlier, canned tuna was a commodity or commodity-like product; (b) Defendants dominated the market for the processing of tuna and the production and sale of canned tuna in the United States; (c) There were barriers to entry into the market for the production and sale of canned tuna in the United States; and (d) U.S. market conditions were ripe for collusion because, as noted earlier, the supply of canning-grade tuna was increasing and the U.S. demand for canned tuna was declining.

5.      Since July 2015, a number of public sources have reported or indicated that the United States Department of Justice ("**DOJ**") has an ongoing criminal antitrust investigation of Defendants and their co-conspirators regarding their marketing, pricing or sale in the United States of canned tuna and other products.  Upon information and belief, that investigation was prompted by information the DOJ learned about anticompetitive conduct by Defendants and others upon an agency review of Thai Union's proposed acquisition of Bumble Bee in 2014-2015.  On December 3, 2015, Thai Union and Bumble Bee called off their deal, and that same day, William Baer, the Assistant Attorney General who oversees the DOJ's Antitrust Division, commented that "[the DOJ's] investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse."

6.      Public sources report that at least one company – one of the Defendants alleged in this Complaint whose identity is not yet publicly known – has confessed to DOJ about the existence of

the conspiracy and its participation in it in return for amnesty under DOJ Antitrust Division's Leniency Program.  Under DOJ's published guidelines for its Leniency Program, a company cannot obtain conditional amnesty from criminal prosecution unless it admits to violating the U.S. antitrust laws.

7.     The allegations in this Complaint, including allegations in subparagraphs, are pled in the alternative if necessary to avoid inconsistency, if any.

## II.     VENUE

8.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and for permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

9.     This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§ 1331 & 1337.

10.     Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below.

(a)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District, including the sale of canned tuna to one or more Plaintiffs and others at supracompetitive prices;

(b)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District;

(c)     Defendants transact business or are found in this District, and, therefore, venue is proper under 15 U.S.C. § 22; and/or

(d)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

III.   **PARTIES**

    A.   **Plaintiffs**

    11.   Plaintiff Meijer, Inc. and Meijer Distribution, Inc. (collectively, "**Meijer**") are Michigan corporations, with their principal place of business located in Grand Rapids, Michigan. During the time period relevant to Plaintiffs' claims, Meijer directly purchased canned tuna in the United States from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business or property as a proximate result of the antitrust violations alleged in this Complaint.

    12.   Each Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

    B.   **Defendants**

    13.   Defendant Bumble Bee Foods LLC ("**Bumble Bee**") is a Delaware corporation, with its headquarters and principal place of business in San Diego, California. Bumble Bee is defined to include its officers, employees, and agents acting on its behalf. Bumble Bee maintains canned tuna processing facilities in San Diego, California, and it maintained a plant in Puerto Rico that it closed in approximately June 2012. Bumble Bee's 2014 annual revenue exceeded $1 Billion. Bumble Bee is owned by Lion Capital LLP ("**Lion Capital**"), a private equity firm based in the United Kingdom. Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million, from Centre Partners Management LLC, a U.S.-based private equity firm. In 2014, Lion Capital agreed to sell Bumble Bee to Thai Union for $1.51 Billion. However, due to concerns about the antitrust violations alleged in this Complaint, Lion Capital and Thai Union announced on December 3, 2015, that they were not proceeding with the deal.[1] During the time period relevant to Plaintiffs' claims, Bumble Bee directly participated in the conspiracy alleged in this Complaint; Bumble Bee produced and sold canned tuna throughout the United States and its territories; Bumble Bee directly sold canned tuna

---

    [1]   *See* https://www.law360.com/competition/articles/734219/bumble-bee-thai-co-drop-1-5b-tuna-tieup-over-doj-fears.

to Plaintiffs and others in the United States; and Bumble Bee engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

14.     Defendant StarKist Company ("**StarKist**") is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its headquarters and principal place of business in Pittsburgh, Pennsylvania.  StarKist is defined to include its officers, employees, and agents acting on its behalf.  During at least some of the relevant time period, StarKist operated a tuna processing facility in Pago Pago, American Samoa.  Although StarKist's annual revenue is not publicly reported, the Pittsburgh Post-Gazette reported in early 2010 that StarKist's annual revenue was between $650 and $670 million.  That figure likely grew to approximately $1 Billion in 2014.  In 2008, Dongwon Industries Co. Ltd. ("**Dongwon**") purchased StarKist for approximately $363 Million and thereafter, including during the time period relevant to these allegations, StarKist operated as a wholly-owned subsidiary of Dongwon.  During the time period relevant to Plaintiffs' claims: StarKist directly participated in the conspiracy alleged in this Complaint; StarKist produced and sold canned tuna throughout the United States and its territories; StarKist directly, or on behalf of Dongwon, sold canned tuna to Plaintiffs and others in the United States; and StarKist engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

15.     Defendant Dongwon is a corporation organized, existing, and doing business in South Korea, with its headquarters located in Seoul, South Korea.  Dongwon is a vertically integrated fishing conglomerate that, according to its website, owns the world's largest fishing fleet.  As Dongwon stated in 2008, it acquired StarKist to "establish a strong foothold in penetrating the U.S. market," and the purpose of Dongwon's acquisition was "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution network."  During the time period relevant to Plaintiffs' claims: Dongwon directly participated in the conspiracy alleged in this Complaint or used its dominance or control of StarKist's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; Dongwon directly or through StarKist produced and sold canned tuna throughout the United States and its territories; Dongwon directly or through StarKist sold canned tuna to Plaintiffs and others in the United States; and

1    Dongwon engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the

2    Sherman Act.

3        16.    "StarKist" and "Dongwon" are collectively referred to in this Complaint as the

4    "**StarKist Defendants**."

5        17.    Defendant Tri-Union Foods LLC, doing business as Chicken of the Sea International,

6    Inc. ("**Chicken of the Sea**"), is a corporation organized, existing, and doing business under the laws

7    of the State of California, with its headquarters and principal place of business in San Diego,

8    California.  Chicken of the Sea is defined to include its officers, employees, and agents acting on its

9    behalf.  Chicken of the Sea operates its tuna processing facility in Lyons, Georgia.  In 1997, Tri-

10   Union Foods LLC acquired Chicken of the Sea (which was then called Van Camp Seafood

11   Company), with Thai Union Frozen Products PCL owning a 50% percent share of the limited

12   liability company.  In 2000, Thai Union Frozen Products PCL acquired the remaining 50% share of

13   Tri-Union Foods LLC, and Chicken of the Sea became a wholly-owned subsidiary of Thai Union

14   Frozen Products PCL (and has so remained ever since).  In 2014, Thai Union earned gross profit of

15   $547 Million on worldwide revenue of $3.339 Billion.  During the time period relevant to Plaintiffs'

16   claims: Chicken of the Sea directly participated in the conspiracy alleged in this Complaint; Chicken

17   of the Sea produced and sold canned tuna throughout the United States and its territories; Chicken

18   of the Sea directly or on behalf of Thai Union Frozen Products PCL sold canned tuna to Plaintiffs

19   and others in the United States; and Chicken of the Sea engaged in the unlawful conduct alleged in

20   this Complaint in violation of Section 1 of the Sherman Act.

21       18.    Defendant Thai Union Frozen Products PCL ("**Thai Union**") is a corporation

22   organized, existing, and doing business in Thailand, with its headquarters located in Amphar

23   Muang, Thailand. After acquiring Tri-Union LLC, the company became a wholly-owned subsidiary

24   of Thai Union Frozen Products PCL.  During the time period relevant to Plaintiffs' claims: Thai

25   Union directly participated in the conspiracy alleged in this Complaint or used its dominance or

26   control of Chicken of the Sea's raw material purchasing and tuna business to conspire with the other

27   Defendants and their co-conspirators; Thai Union directly or through Chicken of the Sea produced

28

COMPLAINT AND DEMAND FOR JURY TRIAL                                                        7

and sold canned tuna throughout the United States and its territories; Thai Union directly or through Chicken of the Sea sold canned tuna to Plaintiffs and others in the United States; and Thai Union engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

19.     Tri-Union Foods LLC d/b/a Chicken of the Sea International, Inc. and Thai Union Frozen Products PCL are collectively referred to in this Complaint as the "**Chicken of the Sea Defendants**."

C.     **Co-Conspirators**

20.     Other entities and natural people not named as Defendants combined or conspired with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.   Discovery will establish the full scope, extent and operation of the conspiracy. Plaintiffs reserve the right to amend or supplement this Complaint to add other Defendants or allegations based upon discovery and further investigation.

**IV.   JURISDICTION**

21.     The Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated in the subparagraphs below.

(a)     Defendants are amenable to service of process because each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because each inhabits, transacts business in, or is found in this District.   Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling canned tuna throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including,

without limitation, selling canned tuna to one or more Plaintiffs and others in this District at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the State in which this Federal Court sits because each Defendant has transacted business in the State and because the State's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the State to satisfy due process; and/or

(e)     This Court has personal jurisdiction over Defendants because they and one or more of their co-conspirators contracted to supply services or goods, including canned tuna, in the State where this Federal Court sits; money flowed from Plaintiffs or other purchasers in the State to pay Defendants and their co-conspirators for canned tuna; Defendants and one or more of their co-conspirators transact business in the State in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts alleged in this Complaint to be done, or consequences to occur, in the State; Defendants and their co-conspirators engaged in unlawful conduct described below outside of the State causing injury to one or more Plaintiffs in the State, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this State or the Constitution of the United States.

22.     The foreign Defendants (Dongwon and Thai Union) are also subject to the personal jurisdiction of this Court for any one or more of the reasons stated in the subparagraphs below.

(a)     This Court has personal jurisdiction over the foreign Defendants because their respective contacts with the United States subjects each to general jurisdiction in this State.  Each foreign Defendant sells a substantial volume of seafood in the United States, and attends meetings and conferences in the United States related to this business, and each has purposefully availed itself of the laws of the United States and its territories.  Dongwon also owns, either directly or indirectly, multiple fishing vessels flagged under U.S. law.

(b)     This Court has personal jurisdiction over the foreign Defendants because the U.S. subsidiary for each foreign Defendant acted as its agent and/or alter ego, and each is therefore subject to specific jurisdiction in the United States.

(i)     Chicken of the Sea is the agent and/or alter ego of Thai Union because Chicken of the Sea is a wholly-owned subsidiary of Thai Union, and Thai Union controls or dominates Chicken of the Sea's day-to-day operations, including, without limitation, its production, pricing, hiring, budgeting, capitalization and/or marketing.  Chicken of the Sea enables Thai Union to be vertically integrated, and to sell the tuna that Thai Union catches (either by itself or through contracted fishing vessels) and processes.  The result of the vertical integration between Chicken of the Sea and Thai Union is that the two companies effectively function as one single entity for purposes of the conspiracy.  But for the functions performed by Chicken of the Sea to sell canned tuna to Plaintiffs and other retailers in the United States, including the acts in furtherance of the conspiracy alleged in this Complaint, Thai Union would have performed those functions and acts itself.

(ii)    StarKist is the agent and/or alter ego of Dongwon because StarKist is a wholly-owned subsidiary of Dongwon, and Dongwon controls StarKist's day-to-day operations, including its production, pricing, hiring, budgeting, capitalization, and/or marketing.  StarKist enables Dongwon to be vertically integrated, and to sell the tuna that Dongwon catches and processes.  The result of the vertical integration between StarKist and Dongwon is that the two companies effectively function as one single entity for purposes of the conspiracy.  As Dongwon stated in 2008, it acquired StarKist to "establish a strong foothold in penetrating the U.S. market," and the purpose of Dongwon's

acquisition was "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution network." But for the functions performed by StarKist to sell canned tuna to Plaintiffs and other retailers in the United States, including the acts in furtherance of the conspiracy alleged in this Complaint, Dongwon would have performed those functions and acts itself.

(c)     This Court has personal jurisdiction over the foreign Defendants because each purposefully directed or participated in the conspiratorial conduct alleged in this Complaint in or at the United States. The acts alleged in this Complaint committed by StarKist were, upon information and belief, performed with the knowledge, under the direction, and for the benefit of StarKist's owner, Dongwon. The acts alleged in this Complaint committed by Chicken of the Sea were, upon information and belief, performed with the knowledge, under the direction, and for the benefit of Chicken of the Sea's owner, Thai Union.

## V.     TRADE AND COMMERCE

23.     During the time period relevant to Plaintiffs' claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)     Defendants and their co-conspirators sold and shipped substantial quantities of canned tuna in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the canned tuna;

(b)     Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c) Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d) Defendants and their co-conspirators imported substantial quantities of raw materials for canned tuna from outside the United States.

24. The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## VI. THE PRODUCTION OF CANNED TUNA

25. There are several levels in the production of canned tuna. Initially, the tuna is caught by fishing vessels, which operate in the Pacific, Atlantic, and Indian Oceans (although the majority of tuna comes from the Pacific Ocean). After it is caught, the tuna is frozen or refrigerated. Both Dongwon and Thai Union control extensive tuna fishing fleets used, at least in part, to supply canning-grade tuna to StarKist and Chicken of the Sea, respectively.

26. In addition to the fleets controlled by Dongwon and Thai Union, tuna trading companies buy the tuna from fishing vessels and coordinate transshipment of catches to tuna processors, including Defendants. During the time period relevant to Plaintiffs' claims, the major tuna trading companies were: the Tri-Marine Group, a foreign organization that does business in the United States through Tri-Marine International, Inc., Tri-Marine Management Company, LLC, Tri Marine Fishing Management LLC, Tri Marine Fish Company, and The Tuna Store, LLC; Itochu Corporation, a Japanese company in the tuna business through its Food Company, which it owns and controls; and Fong Cherng Fishery Company Ltd. ("**FLF**"), a privately-held Taiwanese company.

27. After tuna trading companies buy the tuna or Dongwon- or Thai Union-controlled vessels catch the tuna, they arrange its delivery to a processing plant where it is cooked (usually by steaming), cleaned, filleted, and prepared for canning. For example, Bumble Bee describes the process as follows:

> Upon arrival to the local processing plant, the whole frozen tuna rounds are put into cold storage. The rounds are first inspected for quality, then grouped by size and weight for the most accurate thawing and cooking times. The processing begins when the tuna is removed from the plant freezer, thawed in

water and prepared for cleaning.  The tuna is then loaded into metal racks, which are wheeled into large steam pre-cookers.  Tuna is cooked for a prescribed time and temperature depending upon the size of the fish.  Once the tuna is cooled, the tuna meat is removed from the bones.  The tuna loins are placed in bags, blast frozen to lock in moisture and placed on pallets for shipment to canneries in the United States.  The frozen loins are shipped directly to the cannery where the canning process is entirely automated.  The tuna move in a single line from the filling machine to the packaging sealer.  The sealed product is then cooked, cooled, and labeled.  Once they pass Quality Assurance approval, the cans are prepared for shipment to your local market.[2]

28.    After processing, the tuna is then canned.  Chunk-style tuna is conveyed through a chopper, while solid-style tuna is packed directly into the can.  Along with the tuna, the can is filled with varying types of liquid (usually vegetable oil or water) before it is sealed.  After the can is sealed, it is cooked under pressure to allow for sterility and a long shelf-life.  The tuna cans are then sold to retailers.

29.    Each Defendant sources tuna loins from outside the United States which it cans and sells inside the United States and its territories.  Bumble Bee, for example, buys albacore loins from traders in the Western/Central Pacific Ocean (*e.g.*, the Fiji area), the Indian Ocean (*e.g.*, Mauritius) and the product is shipped to its cannery in Los Angeles for canning and sale in the United States.  Bumble Bee also buys light meat loins from traders in the Western/Central Pacific Ocean (*e.g.*, Papua New Guinea), the Indian Ocean (*e.g.*, Thailand) and the Eastern Pacific Ocean (*e.g.*, Ecuador) and the product is shipped to its Los Angeles Cannery for canning and sale in the United States.

## VII.    TUNA SUPPLY, DEMAND AND PRICING

### A.    The Supply of Tuna Increased Substantially

30.    Technological advances in fishing over the last 40 years, due mostly to the advent of the purse seine for tuna fishing (a method for fishing involving the use of large nets that engulf and capture entire schools of fish) have increased the volume of skipjack caught annually.  Compared to 1975, when purse seining accounted for a negligible share of the global fish catch, the method is now responsible for 66% percent of all tuna caught globally.

---

[2]        *See* http://www.BumbleBee.com/tracemycatch/results.

31.    The following chart demonstrates the proliferation of purse seining in the Western and Central Pacific Ocean (which sources approximately 60% of the world's tuna) relative to other methods of tuna fishing, such as longline and pole fishing methods.



32.    The advances in fishing technology have increased the efficiency of fishing and substantially lowered the cost necessary to fish for tuna on a commercial scale.  According to the Pacific Islands Forum Fisheries Agency ("**FFA**"), between 1986 and 2007, the average annual catch per tuna fishing vessel roughly doubled, from 3,750 metric tons to 7,100 metric tons. This, in turn, has spurred substantial recent investment in fishing vessels.  Between approximately 2007 and 2011, the number of tuna fishing vessels increased by more than 25%.

33.    The combination of increased investment in tuna fishing vessels and improved efficiency of those vessels has resulted in a dramatic increase in the volume of canning-grade tuna caught annually.  As the following chart depicts, between 1984 and 2014, the volume of skipjack caught annually increased roughly three-fold:



**GLOBAL SKIPJACK CATCH VOLUME (Tons)**

B. **The Demand For Canned Tuna in the United States Decreased Substantially**

34.     Although demand for canned tuna is relatively insensitive to price (*i.e.*, inelastic), there has been a substantial decline in both the demand for and consumption of canned tuna in the United States over the last decade.  Between 2003 and 2009, annual canned tuna consumption in the U.S. fell from 3.4 pounds of per capita to approximately 2.5 pounds in 2009, with consumption continuing to decline thereafter.  The following chart depicts the declining per capita consumption of canned tuna in the U.S:

35.     Demand for canned tuna in other developed countries has declined per capita as well. In Japan, consumption of canned tuna declined by approximately 20% from 1995 to 2007, while overall consumption in Western Europe remained stagnant between 2000 and 2010. Notwithstanding this trend of declining consumption, the United States, Western Europe, and Japan accounted for more than 50% of all global canned tuna consumption in 2008 according to the FFA. Further, the United States remained the largest consumer of canned tuna in the world, accounting for approximately 28% of global consumption in 2010.

C.     **Canned Tuna Prices Increased Substantially In Spite of Increased Supply and Declining U.S. Demand**

36.     In the face of declining U.S. demand for canned tuna and increasing supply of canning-grade tuna, market forces should have put substantial downward pressure on the price of canned tuna sold to Plaintiffs and others in the United States.  Instead, because of the conspiracy, the opposite occurred.

37.     The graph below is a depiction of how canned tuna market prices behaved in the United States between 2005 and 2013 according to an industry source (Food and Agriculture Organization of the United Nations):



38.     During the conspiracy, the pricing of canned tuna to the broader U.S. market influenced and detrimentally affected the prices of canned tuna that each Plaintiff paid to Defendants and their co-conspirators.  This is because a market in which canned tuna prices were increasing or otherwise above competitive levels made it more difficult for each Plaintiff to negotiate lower prices for the canned tuna that each of them bought from Defendants.

39.     During the conspiracy (and because of it), canned tuna prices sold to U.S. retailers, including Plaintiffs, increased (or were otherwise above competitive levels) while the tuna catch increased and U.S. demand for canned tuna declined.  This incongruity is also reflected in the histogram below, which shows that although per capita U.S. canned tuna consumption continued to decline after approximately 2010–2011, the dollar amount spent on canned seafood in the United States actually increased (canned tuna accounts for approximately 75% of all canned seafood spending):



40.     Defendants and their co-conspirators' pricing of canned tuna sold to Plaintiffs and others in the United States is not consistent with expected pricing of a commodity product for which there is excess supply and production capacity and declining U.S. demand.  To the contrary, during the conspiracy, the prevailing market conditions in the U.S. canned tuna industry would predict

*decreasing* prices. However, as alleged in this Complaint, canned tuna prices – including the prices Defendants and their co-conspirators charged Plaintiffs – are explained by the conspiracy.

41.     The higher canned tuna prices resulted in substantial profits for Defendants. Thai Union (owner of Chicken of the Sea) saw its net profit increase from $61 Million in 2008 to $140 Million in 2014. In its 2013 Annual Report, dated February 24, 2014, Thai Union attributed its increasing profits and profit margins to "more rational US market competition" for branded canned tuna products. This "more rational" competition was not competition at all; it was collusion. The following year, in its 2014 Annual Report, Thai Union doubled down on this sentiment, commenting that:

> Thanks to *reduced price competition* (absence of cut throat pricing) and generally lower fish cost, our own tuna brands marked a great year of increased profitability. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand. (Italics added.)

42.     Bumble Bee has been similarly profitable. As alleged earlier, Lion Capital purchased Bumble Bee for $980 Million in 2010, and reached an agreement to sell it to Thai Union in 2014 for $1.51 Billion. In announcing the sale, Lion Capital noted that Bumble Bee's EBITDA in 2014 was a record-breaking $150 Million, on revenue of $1 Billion.

43.     Upon information and belief, StarKist, which has the largest U.S. market share and would also stand to gain from supracompetitive pricing, has been similarly profitable.

D.     **Defendants' Pricing of Canned Tuna to Plaintiffs and Others Was Against Defendants' Self-Interest But For Their Collusion**

44.     As alleged above, during the conspiracy, the market for the production and sale of canned tuna in the United States was concentrated in a relatively few firms, *i.e.*, Bumble Bee, Chicken of the Sea, and StarKist. However, none of these companies had the power, unilaterally, to control the supply or price of canned tuna sold in the United States. Because of the commodity-like nature of canned tuna, and the prevailing supply and demand conditions for the production and sale of canned tuna in the United States, unilateral attempts by any one of them to manipulate canned tuna price or supply posed substantial commercial risks. A unilateral increase in price not followed

by others would simply lead to lost sales.  A unilateral reduction in production would be costly because market share would be lost and revenue would likely fall while fixed costs (*e.g.*, labor, distribution, overhead, facility operation, facility maintenance, etc.) would remain relatively the same.  Under the circumstances, Defendants and their co-conspirators' canned tuna pricing actions during the conspiracy would have been against their self-interest unless they were colluding.

## VIII.  THE MARKET FOR THE PRODUCTION AND SALE OF CANNED TUNA WAS CONDUCIVE TO CARTELIZATION

### A.  Tuna is a Commodity Product

45.  "Canned tuna" includes both "white" tuna fish, which consists of Albacore tuna, and "light" tuna fish, which consists primarily of Skipjack tuna.  Both varieties of canned tuna are typically packed in either water or vegetable oil.  Light tuna accounts for approximately two thirds of total sales in the United States by volume.

46.  The demand for canned tuna is highly inelastic.  An article in the *Journal of International Food & Agribusiness Marketing* calculated a price elasticity of demand coefficient of -0.3 for canned tuna, which is consistent with "a consumer product widely viewed as almost a necessity in a well-stocked pantry."[3]  Price elasticity means or implies that a small change in supply can accomplish a large increase in price.  For example, in this context, a demand elasticity of -0.3 implies that a 10% increase in price can be achieved by controlling supply sufficiently to reduce supply by only 3%.  Due to its inelasticity, small changes in the supply of canned tuna can effect large changes in price, and price increases are highly profitable for suppliers because the percentage change in price far outweighs the percentage reduction in sales.  Collusion is thus more feasible (or plausible) where, as here, the demand for canned tuna is inelastic.

47.  Canned tuna is a commodity product and possesses commodity-like characteristics in that the product of one seller is interchangeable with the product of another.  As a commodity or commodity-like product, Defendants could not sustainably affect canned tuna prices in the U.S. unless they acted together.

---

[3]  Babula & Corey, Journal of International Food & Agribusiness Marketing, Volume 16.2 (July 2004), available at http://www.tandfonline.com/doi/abs/10.1300/J047v16n02_09.

B.    **The Market for the Processing and Sale of Canned Tuna Is/Was Concentrated**

48.    Over the past two decades, the canned tuna industry has undergone a high degree of consolidation.  As a result of this consolidation, and during the conspiracy, the U.S. canned tuna industry had become highly concentrated.

49.    During the conspiracy, the market for the production of canned tuna was dominated by Defendants and their co-conspirators.  But for the conspiracy alleged in this Complaint, Defendants and their co-conspirators would have to compete on price.  Although estimates of their respective market shares vary somewhat, StarKist, Bumble Bee, and Chicken of the Sea's branded products account for approximately 80% of the canned tuna market in the United States.  Further, Chicken of the Sea, which has the smallest domestic market share of the three Defendants for branded canned tuna, is the largest supplier of private-label canned tuna in the United States.  During the conspiracy, Defendants processed at least 85% of all domestically-produced canned tuna sold in the United States.

C.    **Barriers to Entry**

50.    During the time period relevant to Plaintiffs' claims, there were barriers to entry into the market for the production and sale of canned tuna in the United States, including, without limitation:

(a)    New entrants were faced with substantial start-up costs, including the need to gain access to distribution channels and retail outlets.  Additionally, substantial manufacturing expertise was required to enter the U.S. market.  These start up costs reduced the opportunity or ability for rivals to enter the U.S. market and undercut Defendants and their conspirators' supracompetitive pricing.

(b)    New entrants and existing market participants faced substantial upfront, industry-specific costs to build a plant to process tuna loins into canned tuna.  For example, the cost for Tri-Marine simply to modernize the plant it acquired from Chicken of the Sea in Pago Pago, American Samoa, in 2010, was approximately $70 million.  (The plant did not reopen until approximately 2015).

(c)     The method used for processing canned tuna in the United States was capital intensive.  Given the cost to Tri-Marine of modernizing Chicken of the Sea's Pago Pago plant, the purchase of real estate and the construction of a new canned tuna processing facility in the mainland United States would likely cost in excess of $70 Million, and require substantial industry expertise to build and operate.

(d)     Restrictive tariffs of between approximately 6% and 35% on the importation of canned tuna into the United States impaired the ability of foreign suppliers from capitalizing on supracompetitive domestic pricing of canned tuna.

D.     **Prevailing Supply and Demand Factors Incentivized Collusion**

51.     As discussed in Section VII, *supra*, during the conspiracy, Defendants and co-conspirators faced supply and demand factors that should have led to declining prices for canned tuna in the United States.  The declining consumption of canned tuna in the United States resulted in excess production capacity for canned tuna.  Defendants and co-conspirators had sufficient production capacity in the United States to supply consumers with 3.4 pounds of canned tuna per capita in 2003.  But by 2009, when annual per capita consumption had fallen to 2.5 pounds, a large portion of Defendants and their co-conspirators' capacity went unused.  Accordingly, the expanding global supply of canning-grade tuna coupled with declining demand for canned tuna and the excess domestic production capacity in the United States left the canned tuna industry ripe for collusion.

IX.     **OVERT ACTS SUPPORTING THE ALLEGED ANTITRUST VIOLATIONS**

52.     As noted earlier, by at least 2010-2011, the owners of Chicken of the Sea (Thai Union), StarKist (Dongwon), and Bumble Bee (Lion Capital) shared a common objective or imperative to realize investment grade returns on and revenue growth for their respective canned tuna businesses.  By then, Thai Union had set a revenue target (in 2008) of $3 billion annually by 2012 to finance further acquisitions, Dongwon had paid $363 million for StarKist (in June 2008), and Lion Capital had paid $980 million for Bumble Bee (in December 2010).  These revenue and profit goals or needs could not have been attained if a competitive market price for canned tuna prevailed in the United States.  The United States was a lucrative and important target for these

firms, as more canned tuna was consumed in the United States than any other country in the world. As a result, to satiate their objective or need to realize investment grade returns on and revenue growth for their respective canned tuna businesses, starting at a time uncertain, but at least as early as 2010-2011, and continuing until at least July 2015 – when news of DOJ's criminal investigation became public – Defendants and their co-conspirators entered into and engaged in a continuing conspiracy not to compete on the sale of canned tuna sold to Plaintiffs and others in the United States.  Defendants concealed their conspiracy, and thus discovery will be necessary to reveal the full scope of their cartel.  That said, overt events in furtherance of the conspiracy are alleged below.

53.    Defendants and their co-conspirators carried out their conspiracy through in-person meetings and communications, including *inter alia* e-mail and telephone calls.  During these meetings and communications, they agreed on conspiracy terms as alleged in this Complaint, and exchanged confidential canned tuna pricing and production information, including future confidential pricing and production information and the timing and amount of price increases to Plaintiffs and others in the United States, which enabled them to realize their financial goals.

54.    For example, and without limitation, some of the meetings and/or communications in furtherance of the conspiracy occurred under cover of several trade groups, including *inter alia* the National Fisheries Institute's ("**NFI**") Tuna Council, and the International Seafood Sustainability Foundation ("**ISSF**").

(a)    The NFI is a non-profit organization that is purportedly "dedicated to education about seafood safety, sustainability, and nutrition."  The Tuna Council is a trade association that is part of the NFI.  It meets multiple times per year and existed during the conspiracy period.  StarKist, Bumble Bee and Chicken of the Sea are the only members of the Tuna Council. During the conspiracy period and in furtherance of the conspiracy, Defendants and their co-conspirators met or otherwise communicated under the guise of the Tuna Council and exchanged confidential pricing, production and other information pertaining to the production, pricing, and/or sale of canned tuna.

(b)   The ISSF is a trade group to which Defendants belong.  The ISSF existed during the conspiracy period.  StarKist, Bumble Bee and Chicken of the Sea founded the ISSF in 2009.  Its members also include fishery and cannery companies that catch and process tuna.  During the conspiracy period and in furtherance of the conspiracy, Defendants and their co-conspirators met or otherwise communicated under the guise of the ISSF and exchanged confidential pricing, production and other information pertaining to the production, pricing, and/or sale of canned tuna.

55.   Defendants and their co-conspirators' conduct had the effect of maintaining, stabilizing, fixing and/or increasing the price of canned tuna sold to Plaintiffs and others in the United States.  For example, and without limitation:

(a)   In 2010 and 2011, Defendants, through the Tuna Council, partnered with the Thai Food Processors Association – of which Thai Union was a member – to plan and then launch a U.S. advertising campaign called "Tuna the Wonderfish," ostensibly to stimulate demand for canned tuna in the United States.  During the planning and implementation of this marketing campaign (and later), Defendants exchanged their respective confidential information about the production and pricing of canned tuna sold in the United States in order to stabilize, maintain, fix and/or increase the price of canned tuna sold to Plaintiffs and others in the United States at the time. In a March 2011 interview with the *New York Times* regarding the advertising campaign, Joe Tuza, a senior vice president for StarKist, acknowledged that it was not difficult for the Defendants to agree on the concerted marketing efforts, further commenting that "we worked together surprisingly well....  Our hope is that as the water level rises, all boats rise with the tide."  As Bumble Bee's CEO, Chris Lischewski, explained in an article dated April 12, 2011: "My big challenge is that Americans think tuna is cheap protein. ... It's too cheap."  Bumble Bee, and the other Defendants and their co-conspirators, used the conspiracy to change this, and to price canned tuna sold to Plaintiffs and others in the United States above a competitive level.

(b)   In 2011, Defendants and their co-conspirators executed a series of collusive price increases of canned tuna sold to Plaintiffs and others in the United States.  For example, and without limitation, between approximately March and June 2011, StarKist, Bumble Bee, and

Chicken of the Sea each announced collusive price increases on canned tuna products sold to Plaintiffs and others.  Between approximately December 2011 and January 2012, Bumble Bee, Chicken of the Sea and StarKist collusively increased prices of canned tuna sold to Plaintiffs.  Indeed, throughout the conspiracy period, Defendants and their co-conspirators collusively maintained or increased prices of canned tuna sold to Plaintiffs above a competitive level.

(c)     In approximately 2011, Bumble Bee and Chicken of the Sea entered into co-packing agreements in which Bumble Bee's factory in Santa Fe Springs, California, would pack and can the tuna for Chicken of the Sea's west coast operations, and Chicken of the Sea's plant in Lyons, Georgia, packed the canned tuna for Bumble Bee's east coast operations.[4]  This co-packing arrangement enabled Bumble Bee and Chicken of the Sea to directly monitor each other's output and pricing and ensure that each conformed with the conspiracy.

(d)     During the conspiracy, to ensure that Defendants and their co-conspirators were able to implement or maintain their collusive and supracompetitive price increases, each Defendant had a policy that it would not accept orders from a customer that exceeded the customer's historical buying pattern whenever a price increase was pending.  For instance, Steve Hodge, StarKist's Senior Vice President of Sales, explained this policy: "StarKist will not accept Customer buyout orders which exceed normal ordering patterns."  By maintaining this policy, each conspirator refused to increase market share while a price increase was pending and thus enforced their conspiracy.

56.     The examples of conduct by Defendants and their co-conspirators in the immediately preceding paragraph and its subparts are representative of collusive efforts by Defendants and their co-conspirators to maintain, stabilize, fix and/or increase the price of canned tuna sold to Plaintiffs and others in the United States during the conspiracy.

---

[4]     *See*    https://www.undercurrentnews.com/2014/12/19/can-thai-union-bumble-bee-tie-up-reverse-us-tuna-consumption-decline/.

X.     **DOJ INVESTIGATION AND AMNESTY APPLICATION**

57.     In July 2015, published reports revealed that the United States Department of Justice had convened a Grand Jury to investigate potential antitrust violations by companies in the market for the production, pricing and/or sale of packaged seafood, including canned tuna.   Upon information and belief, Chicken of the Sea, Bumble Bee, Thai Union and their co-conspirators are the subject of this criminal investigation.  For example, and without limitation:

(a)     On July 23, 2015, Bumble Bee acknowledged receipt of a grand jury subpoena, stating: "The Company [Bumble Bee] did receive a grand jury subpoena relating to a US Department of Justice investigation into potential antitrust violations in the packaged seafood industry."

(b)     On July 23, 2015, Thai Union confirmed that its subsidiary, Tri-Union Seafoods LLC, "operating in the United States under the Chicken of the Sea brand, has received a subpoena   requiring   the   production   of   relevant   information   to   DOJ."   *See* http://tuf.listedcompany.com/misc/ppo/20150723-tuf-qanda-moneyrefund-en-02.pdf.

(c)     Upon information and belief, StarKist is a target of the Grand Jury investigation, though it has not stated this publicly.

58.     An indication that something was afoot occurred on July 17, 2015, when Thai Union – which had previously announced an initial public offering ("IPO") to finance the acquisition of Bumble Bee – publicly stated that it was suspending the IPO.  *See* http://www.nationmultimedia. com/business/TUF-suspends-preferential-public-offering-over-US-30265095.html_.   As alleged above, on December 3, 2015, Thai Union and Bumble Bee notified the DOJ that they would not proceed with the deal.  Their decision to cancel the sale was due to their concerns regarding the antitrust investigation and potential liability to their customers for anticompetitive behavior.  *See*  https://www.law360.com/competition/articles/734219/bumble-bee-thai-co-drop-1-5b-tuna-tieup-over-doj-fears.

59.     As previously alleged, William Baer, the head of the DOJ's Antitrust Division, commented on the Government's investigation into Defendants that **"Our investigation convinced**

**us – and the parties knew or should have known from the get-go – that the market is not functioning competitively today, and further consolidation would only make things worse.”** (Emphasis added.)

60.    Upon information and belief, a Defendant or co-conspirator has gone to DOJ and revealed the existence of the conspiracy alleged in this Complaint and its participation in it, and acknowledged a criminal violation of the U.S. antitrust laws in exchange for amnesty from criminal prosecution by DOJ.[5]   Upon information and belief, DOJ has granted this Defendant or co-conspirator conditional amnesty.

## XI.    TOLLING OF THE STATUTE OF LIMITATIONS DUE TO FRAUDULENT CONCEALMENT

61.    The statutes of limitation as to Defendants and their co-conspirators’ continuing antitrust violations alleged in this Complaint were tolled because of one or more of the following events:

(a)    The pendency of one or more Class Action Complaints against Defendants and their co-conspirators for conspiring to fix prices of canned tuna tolled the running of the statute of limitations on Plaintiffs’ claims; and/or

(b)    Defendants’ affirmative and fraudulent concealment of the conspiracy, as alleged below, prevented Plaintiffs from having notice of their claims until on or about July 23, 2015, and tolled the statute of limitations on Plaintiffs’ claims.

62.    Plaintiffs did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims.  As alleged below, more than four years before Plaintiffs filed this Complaint, Defendants and their co-

---

[5]    DOJ’s Type “B” leniency requires an admission by the applicant that the company committed a criminal violation of the antitrust laws.  *See* http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program.  The confession of wrongdoing must be “truly a corporate act, as opposed to isolated confessions of individual executives or officials.”

conspirators fraudulently concealed the existence of each Plaintiff's antitrust claim so that each Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

63.    During the time period relevant to Plaintiffs' claims, including the time period more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators concealed the existence of Plaintiffs' antitrust claims from Plaintiffs as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below.  As a result, Plaintiffs did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of their antitrust claims more than four years before filing this Complaint.

64.    Notwithstanding the self-concealing nature of their conspiracy, during the time period relevant to Plaintiffs' claims, including more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators affirmatively misled Plaintiffs by wrongfully and affirmatively concealing the existence of Plaintiffs' antitrust claims from Plaintiffs by, without limitation, one or more of the acts alleged below:

(a)    Providing Plaintiffs with false or misleading and pretextual explanations for Defendants and their co-conspirators' collusive increase in the price of canned tuna sold to Plaintiffs and others in the U.S.  For example, and without limitation:

(i)    StarKist initiated a price increase for canned tuna to Plaintiffs and others on or about March 2, 2011, and justified the price increase due to higher fish, fuel, and packaging costs.

(ii)    Bumble Bee informed its customers (including Plaintiffs) of a price increase for canned tuna on March 14, 2011, which it attributed to "increases in the costs of protein, packaging, transportation and fuel over the last two years."

(iii)    In a letter to its customers on June 15, 2011, Chicken of the Sea announced a price increase for canned tuna, which it attributed to

"persistent global inflationary trends," increased raw material costs and a weak U.S. Dollar.

(iv)     On July 1, 2011, StarKist announced another price increase of canned tuna, attributing the increase to "continuously rising fish costs." StarKist's Director of its Western Zone, James Fazioli, claimed that the Bangkok fish market was softening and that Thai tuna processors were reducing production, which necessitated the cost increase.

(v)      Defendants and their co-conspirators cited their own predictions about where the tuna market was heading as the basis for a price increase. Because these future predictions were unverifiable by Plaintiffs, they provided Defendants with pretexts that allowed for the implementation of collusive price increases.  For example, on January 18, 2012, Chicken of the Sea wrote to its customers, including Plaintiffs, that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna].  All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago."

(vi)     In a letter dated March 30, 2012, Bumble Bee's Scott Cameron, Senior Vice President of U.S. Sales, predicted that a number of "unforecasted elements," some of which would occur "in the second half of 2012," combined to require Bumble Bee to increase its own pricing.

(vii)    In a presentation to customers, Bumble Bee justified its canned tuna price increase by forecasting that the prices of skipjack and albacore would rise approximately $120 and $200 per metric ton, respectively, over the next six months.  These raw material price increases did not materialize as predicted by Bumble Bee.

(viii)   Each of the foregoing examples of Defendants' explanations for canned tuna price increases was pretextual and false or misleading, as each price increase was the result of the conspiracy.  The foregoing examples are representative of the pretextual and false or misleading explanations that Defendants and their co-conspirators provided to each Plaintiff during the conspiracy, including more than four years before Plaintiffs filed this Complaint, to explain canned tuna price increases and to conceal the conspiracy.  Defendants and their co-conspirators used these pretextual and false or misleading explanations for canned tuna price increases to create the illusion that each price increase was the result of competition when, in fact, it was the result of the conspiracy.

(b)   Meeting and talking in secret, via telephone, e-mail, and in-person rendezvous to avoid detection.

(c)   Using trade groups, including, without limitation, the Tuna Council and the ISSF, to create the illusion that they were meeting for legitimate purposes when, in fact, they were using one or more of these trade groups to provide cover to conceal their exchange of confidential information in furtherance of the conspiracy.  For example, and without limitation, Defendants used their Tuna Council meetings and communications in 2010, 2011, and 2012 regarding the marketing campaign titled "Tuna the Wonderfish" as cover to conceal their exchange of confidential information in furtherance of the conspiracy.

(d)   Confining knowledge and communications in furtherance of their conspiracy to a limited number of high ranking and/or key employees of each Defendant and its co-conspirators.

(e)   Limiting the creation or circulation of documents reflecting the existence of the conspiracy.

65.   During the conspiracy, including more than four years before Plaintiffs filed this Complaint: Defendants and their co-conspirators' affirmative acts of concealment were intended by

them to conceal the existence of their unlawful actions from Plaintiffs; and Plaintiffs were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

66.     As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, each Plaintiff did not have actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led any Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this Complaint more than four years before Plaintiffs filed the Complaint.  Before then, no Plaintiff was aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in this Complaint.

67.     Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for canned tuna.  For example and without limitation, each Plaintiff used a method of purchasing canned tuna – including, for example and without limitation, seeking price quotes and/or investigating reasonably available public information – that caused it to believe in good faith at the time that it was receiving competitive prices for the canned tuna it purchased from Defendants and their co-conspirators.  Unfortunately, as alleged in this Complaint, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged each Plaintiff for canned tuna during time periods relevant to each Plaintiff's antitrust claim despite each Plaintiff's due diligence during the alleged conspiracy, including the time period more than four years before Plaintiffs filed this Complaint.

68.     Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for each Plaintiff's claim.

69.     Plaintiffs' claims have been brought within the applicable limitations period.

## XII.   **ANTITRUST VIOLATIONS**

70.     Beginning at a time yet to be determined, but no later than approximately 2010–2011, and continuing until approximately July 23, 2015, with an impact that may have continued

thereafter, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of canned tuna in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

71.     The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the production, pricing and/or sale of canned tuna in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

72.     The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were:

(a)     To fix, stabilize, maintain and/or raise prices of canned tuna sold to Plaintiffs and others in the United States; and/or

(b)     To allocate customers, the volume of sales, and/or market shares of canned tuna sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of canned tuna to Plaintiffs and others in the United States.

73.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those acts alleged above):

(a)     They agreed to exchange and did exchange current and future price information about canned tuna sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of canned tuna;

(b)     They agreed to coordinate and did coordinate price levels and price movements or production or sale of canned tuna sold in the United States;

(c)     They agreed on prices and price levels of canned tuna sold in the United States;

(d)     They agreed to and maintained a conspiracy and scheme to fix, stabilize, maintain and/or raise the price of canned tuna sold in the United States; and/or

COMPLAINT AND DEMAND FOR JURY TRIAL                                                                      31

(e)     They agreed not to compete for certain customers or sales, on certain products, and/or in certain regions of the United States.

74.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of canned tuna to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of canned tuna to Plaintiffs and/or others in the United States.

75.     As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of canned tuna among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed and eliminated;

(b)     Prices for canned tuna sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and noncompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of canned tuna produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

76.     Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of canned tuna is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

77.     Plaintiffs are threatened by continuing loss and damage as a result of Defendants and their co-conspirators' unlawful conduct, and Plaintiffs are entitled to injunctive relief.

1

XIII.  **PRAYER FOR RELIEF**

2

      WHEREFORE, Plaintiffs pray for the following relief:

3

      A.    A jury verdict in the amount of the compensatory damages sustained by each Plaintiff.

4

      B.    A judgment against Defendants, jointly and severally, by the Court in treble the

5

amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for

6

attorney's fees, costs and interest as allowable by law.

7

      C.    A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26,

8

enjoining Defendants from future violations of the antitrust laws and from practices which facilitate

9

those violations.

10

      D.    Such other and further relief as the Court may deem just and proper.

11

**JURY DEMAND**

12

      Plaintiffs demand a trial by jury of all issues so triable.

13

Dated:  February 16, 2016               Respectfully submitted,

14

                                    Joseph M. Vanek, Esquire

15

                                    David P. Germaine, Esquire
Alberto Rodriguez, Esquire
VANEK, VICKERS & MASINI, P.C.

16

55 West Monroe Street, Suite 3500
Chicago, Illinois 60603

17

Tel:    (312) 224-1500

18

Fax:    (312) 224-1510
E-mail:  JVanek@Vaneklaw.com

19

                  DGermaine@Vaneklaw.com
                  ARodriguez@Vaneklaw.com

20

21

Paul E. Slater, Esquire
SPERLING & SLATER, P.C.

22

55 West Monroe Street, Suite 3200
Chicago, Illinois 60603

23

Tel:    (312) 641-3200
Fax:    (312) 641-6492

24

E-mail:  PES@Sperling-law.com

25

26

By:   /s/ David P. Germaine

27

      David P. Germaine
      ***Counsel for the Direct Action***

28

      ***Meijer Plaintiffs***